RECEIVED
IN LAKE CHARLES, LA.
APR 20 2010
TONY R. MOORE, CLERK
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | | |
|---|---|---|
| CAROLYN LEE GREEN | : | DOCKET NO. 2:06 CV 1018 |
| VS. | : | JUDGE MINALDI |
| LA. DEPT. OF PUBLIC SAFETY AND CORRECTIONS, et al | : | MAGISTRATE JUDGE KAY |

## MEMORANDUM RULING

Before the Court is a Motion in Limine to Exclude Expert Testimony of Harvey Cox and Michael D. Corbett, filed by defendants Louisiana Department of Public Safety and Corrections, Michael Baxter, Dennis Cloud, Darin Davis, John Harvey, Jr., Rex Holbrook, Blaine Juneau, C.M. Lensing, Keith Lopez, Jeremy Mitchell, Kenneth Overmeyer, Billy Perkins, Herbert Ragle, James Rogers, John Smith, Leonard Smith, Jason Thibodeaux, Brent Thompson, Jerry Williams, and Roy Williams ("State Corrections Defendants") [doc. 153]. The plaintiff, Carolyn Lee Green ("Green"), filed an Opposition [doc. 167]. The State Corrections Defendants filed a Reply [doc. 169].

## FACTS

Green's son, Oliver Green, was incarcerated at multiple Louisiana Department of Public Safety and Corrections ("DPSC") facilities from February 19, 1999 until February 26, 2004.[1] On February 19, 1999, Oliver Green was transferred from the Texas correctional system to Elayn Hunt Correctional Center ("EHCC").[2] On October 6, 2003, he went to C. Paul Phelps Correctional Center

---

[1] Def.'s MIL [doc. 153-1].

[2] *Id.*

("PCC").[3] On February 2, 2004, DPSC moved Oliver Green to Allen Correctional Center ("ACC"), and on February 12, 2004, DPSC transferred him back to EHCC, where he remained until his death on February 26, 2004.[4]

Green's civil rights and state tort law claim alleges that employees of the three correctional facilities deprived Oliver Green of his constitutional rights against cruel and unusual punishment by repeatedly using chemical weapons on him while he was confined to a prison cell. Green alleges that this deprivation caused Oliver Green's pneumonia and death.

## *DAUBERT* STANDARD

Admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The *Daubert* Court articulated a non-exclusive and non-dispositive checklist for federal district courts to use when assessing the reliability of expert testimony. *Id.* This gate-keeping function extends to all expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). Trial judges have "considerable leeway in...determining whether particular expert testimony is reliable." *Id.* at 155. "Both the determination of reliability and the factors taken into account are

---

[3] *Id.*

[4] *Id.*

left to the discretion of the district court consistent with its gatekeeping function under Fed. R. Evid. 702." *Munoz v. Orr*, 200 F.3d 291, 301-02 (5th Cir. 2000).

The first prong of *Daubert* "focuses on whether the expert testimony is based on a reliable methodology...." *Daubert*, 509 U.S. at 595.

> [T]he party seeking to have the district court admit expert testimony must demonstrate that the expert's findings and conclusions are based on the scientific method, and, therefore, are reliable. This requires some objective, independent validation of the expert's methodology. The expert's assurances that he has utilized generally accepted scientific methodology is insufficient.

*Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).

Pursuant to the second prong of *Daubert*, testimony must be "relevant not simply in the sense that all testimony must be relevant, but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact at issue." *Bocanegra v. Vicmar Services, Inc.*, 320 F.3d 581, 584 (5th Cir. 2003).

The party offering the expert must prove, by a preponderance of the evidence, that the proffered testimony satisfies the Fed. R. Evid. 702 test. *Mathis v. Exxon Corp.*, 302 F.3d 448, 459-60 (5th Cir. 2002).

## ANALYSIS

The State Corrections Defendants anticipate that Green will introduce the testimony of Harvey Cox ("Cox"), a corrections expert, and Michael D. Corbett, Ph.D. ("Corbett"), a toxicologist, and they seek to exclude these liability experts for the following reasons: (1) Cox is not qualified as an expert; (2) neither Cox nor Corbett base their testimony upon sufficient facts or data, nor is their testimony the product of reliable principles and methods; and (3) the identities of Cox and Corbett

were not divulged in compliance with this Court's Scheduling Order and as required by Fed. R. Civ. P. 26(a)(1). Green contends that Cox is abundantly qualified, that both experts are relying on sufficient and overwhelming data, and that the expert disclosures were timely.

### Cox's Qualifications and Reliability

In his affidavit, Cox opined that corrections officers should not have used chemical agents on Oliver Green due to his mental status and the unknown effects of long term and repetitive use of chemical agents on an individual's physical health.[5] Further, Cox stated that Oliver Green should have been confined in a non-correctional facility designed for individuals with conditions similar to Oliver Green's conditions or in a Louisiana prison unit specifically designed for mental patients.[6] He also concluded that DPSC employees demonstrated a reckless disregard for the safety and health of Oliver Green.[7] In his deposition, Cox testified that the use of chemical weapons upon confined inmates should be avoided on prisoners in cellblocks.[8]

The State Corrections Defendants argue that Cox does not have the requisite knowledge, skill, experience, training, or education to offer opinions as to the appropriateness of the use of chemical weapons on Oliver Green. The State Corrections Defendants point out that Cox has no experience regarding the use of chemical weapons upon inmates in a confined area, and his only encounter with chemical weapons was in 1972 when he witnessed the use of chemical weapons upon

---

[5] Pl.'s Ex. 9 (Cox Aff.) [doc. 167-9].

[6] *Id.*

[7] *Id.*

[8] Def.'s Ex. 6, p. 39 (Cox Dep.) [doc. 153-7].

4

Case 2:06-cv-01018-PM-KK   DOCUMENT 179   Filed 04/20/10   Page 5 of 12 PageID #: 3625

inmates in an outdoors area.[9] Further, Cox received no training on how to use chemical agents in an enclosed area, such as a cellblock.[10] Cox also admitted he had no experience with the types of cells and ventilation associated with the types of cells in which Oliver Green was incarcerated,[11] and his experience as a warden was limited to low and minimum security prisons.[12]

Finally, the State Corrections Defendants point out that Cox failed to educate himself on Louisiana procedures before espousing opinions in this case, and argue the fact that Cox is unsure whether the correctional officers deviated from Louisiana policy when using chemical weapons evidences a lack of skill, experience, and training and disqualifies him as a corrections expert in this case.[13]

Green insists that Cox is abundantly qualified and points to his list of credentials, noting that Cox has nearly four decades of experience in state and federal prisons nationwide, in all types of security levels.[14] Green acknowledges that Cox never used or witnessed the use of chemical weapons, but argues that is why his opinion is relevant. Green points out that Cox and thousands of other corrections officers in similar facilities were able to control inmates without resorting to chemical weapons; thus, his testimony will aid the jury's understanding. Green also notes that Cox has offered expert testimony in state and federal courts on prison issues over twenty times and has

---

[9] *Id.* at 18, 24, 25-26.

[10] *Id.* at 34.

[11] *Id.* at 32.

[12] Def.'s Exs 6, 7, pp. 98-101 (Cox Dep.) [docs. 153-7, 153-8].

[13] Def.'s Ex. 6, pp. 51, 82 (Cox Dep.) [doc. 153-7].

[14] Pl.'s Ex. 9 (Cox Aff.) [doc. 167-9].

more corrections experience than any person involved in this litigation.[15]

Additionally, the State Corrections Defendants argue that Cox's testimony should be excluded because it is unreliable. The State Corrections Defendants disagree with Cox's contention that the federal correctional system does not allow the use of chemical weapons upon confined inmates. Alternatively, the defendants argue that even if the federal system does not allow the use of chemical weapons on confined inmates that Cox's testimony is irrelevant because this case involves state corrections procedures. The State Corrections Defendants point out that this case centers on the actions of state correctional officers within Louisiana prisons operating under state policies and procedures, as accredited by the American Correctional Association ("ACA"); thus, the defendants contend that Cox's admission that he failed to apprise himself of the Louisiana and ACA policies for the use of chemical weapons upon confined inmates mandates exclusion of his testimony. Finally, the State Corrections Defendants argue that Cox's testimony is unreliable because he relies on outdated ACA standards.[16]

Green argues that Cox's testimony is reliable because his opinions are supported by DPSC rules, ACA standards, Warden Andrews' testimony,[17] and the Federal Bureau of Prisons. Green contends that Cox never stated that the use of chemical weapons on inmates in federal prisons is forbidden; rather, Green argues that Cox's opinion is that chemical weapons should not have been used on a mentally ill inmate in the repetitive manner that the PCC guards allegedly used them and that Oliver Green should not have been housed in a facility like PCC. Green acknowledges that Cox

---

[15] *Id.*

[16] Def.'s Ex. 6, pp. 16-17 (Cox Dep.) [doc. 153-7].

[17] Warden Andrews was Warden at ACC.

6

cites to 1990 ACA standards, but argues that the standards have not changed and neither the 1990 nor the 2010 standards sanction the use of chemical weapons on mentally ill inmates.

Cox is qualified to testify regarding his opinions that: (1) according to ACA standards, DPSC employees should not have used chemical weapons on Oliver Green due to his mental status and (2) that Oliver Green should have been confined in a special facility or a Louisiana prison designed specifically for mental patients. Cox has nearly forty years' experience in state and federal corrections facilities, and he is adequately familiar with ACA standards.

However, Cox is not qualified and may not testify that: (1) chemical weapons should not have been used on Oliver Green because of the unknown effects of long term and repetitive use of chemical weapons; (2) the use of chemical weapons upon confined inmates should be avoided on prisoners in cellblocks; and (3) that DPSC employees violated Louisiana policy and demonstrated reckless disregard for Oliver Green's safety and health. Cox has no experience and received no training in the use of chemical weapons on inmates in confined spaces; thus, he is unqualified on this issue and his testimony on this matter is excluded. Further, Cox is not familiar with DPSC's use of force policy and admitted he was unsure whether corrections officers deviated from Louisiana policies and procedures. Accordingly, the portion of the Motion in Limine regarding Cox's qualification and reliability is DENIED in part and GRANTED in part.

### Corbett's Reliability

In his affidavit, Corbett opined that: (1) prison officials and guards did not use the CS agents according to generally accepted methods, particularly that the agents were not used in a well-ventilated area; (2) Oliver Green was subjected to an exceptionally large total exposure to CS agents over a period of three months; (3) on some occasions prison officials and guards did not respond

7

appropriately to Oliver Green's complaints of illness; and (4) the chemical CS, either through the production of chemical pneumonitis or by leading to the development of bacterial pnuemonia, proximately caused Oliver Green's death.[18]

The State Corrections Defendants argue that Corbett's testimony should be excluded because it is not based on sufficient facts or data and it is not based on a reliable methodology. The State Corrections Defendants point out that prior to this litigation, Corbett had no experience with the chemical substances sprayed on Oliver Green.[19] Corbett conducted research of the literature that revealed no chronic pulmonary effects of CS or OC, yet the defendants note that Corbett focused and relied only on antecdotal evidence. Further, the State Corrections Defendants argue Corbett is ignorant of ACA standards and note his admission that there is no scientifically established level of exposure for humans.

The State Corrections Defendants argue that Corbett's causation opinion is flawed because he failed to rule out or even consider other causes of death, such as Oliver Green's long history of cigarette smoking, and he failed to rule out other causes of Oliver Green's sore throat, such as yelling or bad oral hygiene.

The State Corrections Defendants note that Corbett did not cite any peer-reviewed literature that establishes that CS and OC cause any long-term effects or death. Some of the articles relied on by Green call for further studies of CS, but none establishes a cause and effect relationship, much less a dosing level for where these alleged adverse effects are to occur.

---

[18] Freeze + P is the chemical agent that corrections officers sprayed on Oliver Green, and its ingredients are CS and OC.

[19] Def.'s Ex. 5, p. 22 (Corbett Dep.) [doc. 153-5].

Finally, the State Corrections Defendants attach the affidavit of its toxicologist, Dr. Richard Lipsey ("Lipsey"), who stated that there are no chronic effects from exposure to CS or OC documented in the peer reviewed scientific and medical literature.

Green contends that Corbett's testimony meets the *Daubert* reliability requirements. Green points to scientific papers and articles that state that excessive exposure to these chemicals can cause types of lung disease.[20] Green explains that Corbett could not perform a "study" of the effects of OC and CS in the specific context of prisons because it would have been medically irresponsible.

The exclusion of alternative causes is necessary for a reliable causation opinion. *Michaels v. Avitech, Inc.*, 202 F.3d 746, 753 (5th Cir. 2000). The inadequate treatment of other potential causes necessarily undermines the reliability of an expert's opinion. *See Brown v. Parker-Hannifin Corp.*, 919 F.2d 308, 311-12 (5th Cir. 1990). In *Brown*, an injured worker's expert developed two theories for equipment failure that were consistent with the facts, as testified to by the plaintiff. *Id.* at 312. The Court found that while either of the two theories were possible, other theories explained the failure equally well. *Id.* Ultimately, the Court excluded the expert's testimony, finding that "[w]ithout some basis to establish that one of his theories is the most likely cause of the failure on this occasion, his testimony amounts to speculation and is of no assistance to the jury." *Id.*

Similarly, Corbett's expert testimony should be excluded for its unreliability. In his expert report, Corbett does not mention or exclude any alternative causes of Oliver Green's death. When questioned about Green's long-term smoking habit during his deposition, Corbett admitted to receiving the documentation that Oliver Green smoked, and knew that Oliver Green was "a pack a

---

[20] Pl.'s Ex. 16 [doc. 167-16].

day or two pack a day smoker."[21] Corbett also explained that he considered Oliver Green to be a "former smoker" because he had not smoked during the last four months of his life.[22] During the deposition cross-examination, Corbett admitted that based on Oliver Green's smoking habits, he would have been susceptible to lung damage and more susceptible to contracting pneumonia than a non-smoker.[23] Corbett also acknowledged that smoking can lead to obstructive pulmonary disease.[24] Although Corbett admitted that smoking could have played a part in Oliver Green's lung injury, he does not account for this possibility in his expert report.

Neither does he account for other causes of Oliver Green's hoarseness, except to state "major questions arise as to what caused Mr. Green to develop hoarseness."[25] Corbett received documentation that Oliver Green yelled frequently, and he acknowledged that Oliver Green could have been hoarse from yelling all the time, yet this information was also omitted from the expert report.[26] According to *Daubert*, an expert's report should include a list of data and information used to generate his conclusions. Corbett's expert report failed to consider alternate causes of Oliver Green's hoarseness and his death; thus, his methodology is flawed and his testimony is unreliable. Accordingly, the portion of the Motion in Limine regarding the exclusion of Corbett is GRANTED.

**Disclosure of Experts**

---

[21] Def.'s Ex. 5, pp. 91-92 (Corbett Dep.) [doc. 153-5].

[22] *Id.* at 90-92.

[23] *Id.* at 110-112.

[24] *Id.* at 112-113.

[25] Pl.'s Ex. 4 (Corbett Aff.) [doc. 167-4].

[26] Def.'s Ex. 5, pp. 90-92 (Corbett Dep.) [doc. 153-5].

The State Corrections Defendants note that in Green's Fed. R. Civ. P. 26 disclosures, Green revealed the existence of one expert and point out that the parties' Rule 26(f) report indicates that was the only witness revealed to the defendants.[27] The State Corrections Defendants also note that Green did not reveal any intention to use an expert in the fields of toxicology or corrections. Green retained Cox as an expert in Spring 2009, and the parties filed the Rule 26(f) report in July 2009, but Green did not disclose Cox's identity until January 4, 2010. Likewise, Green retained Cox in July 2009, and did not disclose his identity until February 10, 2010, which was Green's deadline to provide defendants with expert reports. The State Corrections Defendants argue that the fact that Green retained experts by mid-2009 and did not reveal them until 2010 is contrary to Rule 26 and prejudices the defendants. Specifically, the State Corrections Defendants note that after learning of the experts' identities, the defendants rushed to retain their own corrections and toxicology experts and had difficulty finding an expert willing to generate a report by the defendants' February 25, 2010 deadline.

Green argues that the expert disclosures were made timely because she complied with the Court's standing order to reveal experts by February 10, 2010.

A party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Fed. R. Evid. 702, 703, or 705, and the parties must make these disclosures at the times and in the sequence that the court orders. Fed. R. Civ. P. 26(a)(2)(A) and 26(a)(2)(C). This Court's scheduling order mandates that the plaintiff's expert reports were due February 10, 2010. Green sent the defendants Cox's affidavit, appendix, and CV on December 31, 2009. Gren

---

[27] Green's Rule 26 disclosures revealed the identity of Dr. Jesse Adame, a pathologist in Houston, Texas who performed a second autopsy upon Oliver Green at Green's request. Def.'s MIL [doc. 153-1].

provided Corbett's affidavit on February 10, 2010. Green complied with this deadline, and Corbett's testimony is excluded; accordingly, this portion of the Motion in Limine is MOOT.

IT IS ORDERED that the State Corrections Defendants' Motion in Limine is DENIED in part, GRANTED in part, and MOOT in part.

Lake Charles, Louisiana, this 19 day of April, 2010.

PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE